RECEIVED

NOV 3 2005

OFFICE OF THE CLERK
U.S. COURT OF FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| A.A.B JOINT VENTURE<br>P.O. Box 37<br>Rosh Ha' Aiyn<br>68100 Israel,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | Case No. 05-1172C |

**FIRST AMENDED COMPLAINT**

COMES NOW, Plaintiff A.A.B Joint Venture, by its undersigned attorneys, and for its complaint against Defendant, the United States of America, seeks monetary damages and other relief on its claims, and for grounds therefor states as follows:

## I. THE PARTIES

1. Plaintiff, A.A.B Joint Venture ("Contractor" or "Joint Venture") is a joint venture consisting of co-venturers ABB Susa, Inc., A. Arenson, Ltd. and Baran Group. Under the Joint Venture Agreement the parties are equal equity partners, ABB Susa, Inc. is managing partner. The Joint Venture was formed to bid on, and perform, a contract with the United States of America, which contract is the subject of this action.

2. Defendant, the United States of America (the "Government") is a party to the contract at issue, acting by and through the United States Army Engineer Corps-Europe ("USACE" or "COE"), located in Wiesbaden, Germany.

## II. JURISDICTION

3. This suit seeks *de novo* review of the Contracting Officer's denial of a certified claim by the Joint Venture. This Court has jurisdiction over this action pursuant to § 10(a) of the Contract Disputes Act of 1978 (41 U.S.C. § 609(a)) ("CDA") and 28 U.S.C. § 1491.

## III. FACTS COMMON TO ALL COUNTS

4. The project consists of the design and construction of a storage and logistics base complex for use by the Israeli Defense Force ("IDF"), which was a party to the solicitation requirements. The project, known as the Nachshonim Military Storage Base, is located near Elad, approximately 20 km east of Tel Aviv, Israel (the "project"). USACE is the owner and administrator of the project until completion. The project was authorized by the Wye River Accords and implemented by a Letter of Offer and Acceptance (LOA) between the Government of Israel and the U.S. Army Corps of Engineers. Under the LOA the Government of Israel agreed to provide full and complete engineering designs and bidding documents for infrastructure facilities and designs for buildings. The Government of Israel also agreed to cover the payments of successful contract claims.

5. The base complex consists of approximately 200 buildings, 119 of which are Dry Storage Buildings ("DSBs") specifically designed to house heavy military equipment in a ready state within a controlled climate, minimizing environmental impacts from temperature and humidity. The contract contemplated that the DSBs would consist generally of a concrete sub-structure and walls set upon drilled/cast piles or spread footings, a structural steel roof (conventional or spatial-type frame) and outer insulated paneling. The remaining buildings are conventional structures used for logistics, office space, and public and auxiliary use necessary for the operation of the base. The base occupies a circular area of approximately 1,600,000

square meters, or approximately 400 acres, with the buildings located in a radial pattern around two ring roads and ten radial roads, dividing the area into ten segments and one central area. Heavy earthwork, site preparation and the implementation of communications and control systems were included in the scope of the project. Design work by the Contractor was limited to the buildings, the communications and control systems and other design not provided 100% by USACE. USACE provided the 100% design, drawings and specifications for the site infrastructure and site development. The Contractor design for the buildings had to be coordinated with the overall infrastructure and site development design and was also governed by a conceptual design provided by the Defendant as part of the solicitation, which design was based on the requirements of the solicitation's General and Special Specifications that included certain testing and performance specifications.

6. Contractor submitted its proposal and bid for the project on April 9, 2001.

7. On June 5, 2001 Contractor was awarded Contract No. DACA90-01-C-0043 (the "Contract") for $124,089,176. The performance period was stipulated as three years (1,095 calendar days) after the June 19, 2001 Notice to Proceed, establishing an original contract completion date of June 18, 2004.

8. During the course of contract performance, several disputes arose between the parties. The claims asserted in this Complaint represent claims or costs incurred by the Joint Venture. To the extent that said claims and/or costs relate to subcontractor costs, such costs are sponsored by the Joint Venture pursuant to its obligations under the respective subcontracts.

9. This Complaint specifically involves a claim by the Joint Venture for breach of contract, an equitable adjustment in contract price and a compensable/excusable time extension in amounts to be determined at trial.

10. The Joint Venture asserts a claim for an equitable adjustment in contract price to compensate it for the delay and direct costs it has incurred as a result of Defendant's issuance of defective specifications and/or breach of its implied warranty of specification adequacy and/or the issuance of impossible specifications requiring performance beyond the state of the art with respect to the pressure testing requirements for the dry storage buildings ("DSBs") described in paragraph 5 above. The claim also addresses issues pertaining to the Government's constructive changes requiring the panels to meet an L/600 deflection requirement and provide M-20 bolts. These issues are discussed infra.

11. First, the contract required the construction of approximately 200 buildings on a circular area of which 119 were DSBs, specifically designed to maintain a controlled climate minimizing environmental impact from temperature for heavy military equipment, such as tanks and armored personnel carriers.

12. In accordance with the design criteria provided by Defendant, the DSBs consist of a concrete foundation and partial concrete walls upon either drilled/cast piles or spread footings, a structural steel roof (79 of the DSBs were constructed with steel space frame type structural roofs and 40 of the DSBs were constructed with conventional structural steel roofs), with external insulated "sandwich" panel cladding on both the roof and walls.

13. Significantly, compliance with the requirement to place the insulated panel cladding on the exterior above the roof and walls, resulted in a total of approximately 2 miles of seams that had to be hermetically sealed in each DSB.

14. The test section, Specification - - Division 2- Section 003 Dry Storage Buildings, Chapter J, Paragraph 3: (02-003-J-3) set forth the following test requirement which is central to the claim:

> Tests
>
> **The permeability of the joints and the complete structure will be pressure tested twice with positive pressure of 25 mm. of water gauge. This should not drop more than 12 mm. over 30 minutes**. The pressure in the building (for the test) will be created by blowing air into the building by a fan to 25-mm. water gauge and measuring the time and the pressure drop after stopping the fan. The pressure test shall be conducted in the presence of the COR. The contractor shall record the pressure in the building and the barometric pressure outside every five minutes for 45 minutes. (Emphasis added).

That section further states:

> The contractor cannot proceed with the erection of any other building envelopes until both test results of the first building has been approved . . . to prove his design the Contractor must complete one structure and successfully test it prior to construction of subsequent structures . . . The contractor cannot proceed with the erection of the second building until completion of the two tests and acceptance of the first building.

15. Accordingly, the contract required the construction and successful testing of a first DSB building ("Pilot DSB") before the mass production of any further DSB buildings could commence. Per the contract, until the Pilot DSB passed two pressure tests, with the required one month interval between the first and second tests, further DSBs could not commence.

16. The air tightness requirements as stipulated by the pressure test quoted above far exceeded the air tightness and vapor proofing standards for even chemical warfare shelters by over 180 fold.

17. The contractually mandated exterior panel cladding resulted in a configuration that could not meet the contractually required air tightness required by the pressure test.

18. More specifically, the contractually required pressure test could not be met if the DSB contained holes or spaces in the aggregate for the entire structure greater than the size of a pea, 8-mm in diameter.

19. By no later than early October 2001, the Government was aware that the "theoretical" lowest leakage rate for the specified type of building, not including doors, was almost ten times greater than the maximum allowable leakage rate, per the specifications.

20. In spite of that, the COE, with full knowledge that the theoretical lowest leakage rate was ten times higher than that required by the Government's specified pressure test, informed Plaintiff that it would request damages from the JV if the buildings did not perform as specified.

21. The Joint Venture made every effort possible to try to achieve this impossible/ defective specification requirement.

22. From November 2001 through July, 2002, the Joint Venture, with full knowledge of the Government, built multiple mock-ups and performed various tests in an effort to comply with the impossible/defective pressure test requirement. These tests were all unsuccessful.

23. The JV continued to make mock-ups and panel sealing changes in an effort to look for an optimal sealing method to meet the specified test standards.

24. On or about May 14, 2002, the JV again made it clear to the Government that significant time was being lost by the JV's efforts to meet the impossible/defective requirement and requested that the Government, knowing that the system would not pass the test, reduce the criteria to that similar to chemical warfare shelters.

25. In spite of all of the above, the Government refused to reduce the criteria, and the JV continued its research and development work causing further delay to the project.

26. In short, through the spring and summer of 2002, Plaintiff attempted to meet the impossible/defective specification and in doing so expended significant time and expense. In all

the tests that were undertaken, the best results achieved only 4% of the required result (1 minute, 10 seconds compared with the 30 minute contract requirement).

27. By the summer of 2002, it was apparent that the pressure test was unachievable yet the Government was unwilling to relax its specification. As a result the JV began a series of consultations with leading experts in a further attempt to solve this unsolvable problem.

28. Also, during that summer, the Government and Plaintiff conducted site visits in an attempt to see a building in which the requirement had been achieved. However, all buildings which were observed were irrelevant in that one of the buildings was all concrete and the other two had interior panel construction, rather than exterior as required for the DSBs.

29. In spite of the inability to provide even one example of a building that met the specifications and the extraordinary efforts undertaken by the JV to meet the impossible/defective specifications, Defendant continued to insist that the building configuration would not change and that the building remain with internal structural steel covered with external cladding panels.

30. The JV continued its efforts to resolve the problem. However, all of its efforts were unsuccessful.

31. On November 7, 2002, the Government requested that the Plaintiff complete the construction of the initial DSB and perform the various tests necessary to prove its design. It noted significantly that your "alternative testing procedures shall be evaluated in conjunction with this phase of construction."

32. Testing was performed per ASTM E-283 in January, 2003. Those tests also failed to meet the pressure test requirement.

33. Finally, on February 19, 2003, the Government indicated that perhaps the ASTM E-283 test was inappropriate and that ASTM E-779 was an acceptable alternative.

34. Thus, while the Government never made a formal change in the contract requirements, its suggestion that ASTM E-779 was acceptable, was a tacit admission that the original specification could not be achieved.

35. Thereafter on June 3, 2003, the Government approved the pressure test results and stated that the Plaintiffs work on subsequent DSB envelopes could continue.

36. Accordingly, after 19 months of Government-caused delay to the project, resulting from Defendant's unwillingness to change its impossible/defective air tightness/pressure test standards, the Government finally relaxed its requirement, making it 30 times less stringent.

37. Significantly, even this greatly relaxed testing requirement was extremely tight, allowing for holes or spaces between the panels in the enormous DSB structure in the aggregate of no more than a silver dollar (50 mm diameter); rather than a pea.

38. As a direct and proximate result of the aforementioned issues, Plaintiff incurred significant additional costs and delays on the project.

39. The combination of the requirement to place the panels exterior to the structural steel and the Chapter J pressure test requirement breached the Government's implied warranty that if the specifications were followed an acceptable result would be obtained. This breach of the Government's implied warranty caused the Joint Venture to perform additional work beyond that required by the contract and/or the Joint Venture was directed to change its planned method or manner of performing the contract work, for which the Joint Venture is entitled to an equitable

adjustment pursuant to FAR 52.243-4 entitled "Changes" of the Contract General Provisions for all additional costs, impacts and delays incurred as a result thereof.

40. Alternatively, if considered to be a performance specification, the pressure test, when considered with the other relevant specifications, was objectively impossible requiring performance beyond the state of the art. In the alternative, the pressure test requirement when considered with the other relevant specifications rendered performance commercially impracticable. This impossibility/commercial impracticability caused the Joint Venture to perform additional work beyond that required by the contract and/or the Joint Venture was directed to change its planned method or manner of performing the contract work, for which the Joint Venture is entitled to an equitable adjustment pursuant to FAR 52.243-4 entitled "Changes" of the Contract General Provisions for all additional costs, impacts and delays incurred as a result thereof.

41. Second, the contract required that elements of the "roof structure" meet an L/600 deflection requirement. The only reasonable interpretation of the Contract was that those portions of the roof that are structural in nature (i.e., steel beams, joints and purlins), and which actually carry loads for transmission to the ground, were required to meet the L/600 mandate.

42. The exterior panels are not structural in nature. On information and belief they are designed only to withstand specified wind and live loads, but with a maximum deflection of L/250. Thus, the panels are not a part of the roof "structure." Accordingly, the contract, reasonably interpreted did not require the panels to meet the L/600 deflection requirement.

43. However, in a meeting held on December 13, 2001 the Government directed that the panels achieve the above-described maximum deflection of "L/600". This meant that the panels could not flex more than one six-hundredth (1/600) of its length. For example, a ten

meter (32.8 feet) panel could only deflect a *total* of 16.6666 mm (1.666 cm or 5/8 inch) over its length.

44. To meet the L/600 requirement, the JV had to either (1) make the panels significantly thicker than specified so that the panels became stiffer; or (2) add additional roof structural elements in the form of additional purlins. Neither of these efforts were reasonably anticipated nor required by the contract. The JV opted for additional purlins as the most practical solution. Only by performing this action could the non-structural panels (which consist of expanded foam onto which a sandwich of very thin metal skin was attached) effectively meet the L/600 mandate from the USACE.

45. The USACE's requirement that the panels meet the L/600 requirement caused the Joint Venture to perform additional work beyond that required by the contract and/or the Joint Venture was directed to change its planned method or manner of performing the contract work, for which the Joint Venture is entitled to an equitable adjustment pursuant to FAR 52.243-4 entitled "Changes" of the Contract General Provisions for all additional costs, impacts and delays incurred as a result thereof.

46. Third, as part of the Government-provided design, the Government required the use of spatial frames on a number of the DSBs. The space frame, as Plaintiff learned after bid, was based upon the spatial frame system manufactured by the German Company, Mero, which utilized a minimum 20 mm (or "M-20") bolts.

47. The original Solicitation required "Minimum type of bolts – M-20" and the Special Specification required that the bolts for the roof be "not less than 20 mm. . . ."

48. As a result of pre-proposal questions submitted by bidders, the Government issued Amendment No. 6, which deleted the General Description for bolts with a minimum diameter of 20 mm (M-20).

49. In reasonable reliance on Amendment 6 the Joint Venture based its bid on M-16 bolts.

50. Thereafter, on November 22, 2001, the JV submitted a letter claiming that the M-20 bolts were not required.

51. On November 27, 2001, the then ACO, J.W. Blackburn, P.E. responded directing that the spatial frame bolts not be less than 20mm.

52. In the December 13, 2001 meeting the Government stated "ACO to determine acceptability of changing the contract to accept M-16 bolts," and as previously noted demanded L/600 minimum deflection in panels and "JV to conduct tests and provide results to COE. Compliance with L/600 is required for all roof structure elements, including panels."

53. Not until the 31 May 2002 execution of Change Order P0009, did the Government confirm its acceptance of M-16 bolts. Only then could the Plaintiff release the Pilot DSB spatial frame for production. The Government held up approval of M-16 bolts until Plaintiff demonstrated deflection testing to prove the design of panels with minimum L/600 deflection.

54. The USACE's initial attempt to require M-20 bolts and untimely relief from the erroneous interpretation that the Joint Venture provide M-20 bolts, combined with the simultaneous demand that Plaintiff perform testing to prove the panels met the L/600 requirement, caused the Joint Venture to perform additional work beyond that required by the contract and/or the Joint Venture was directed to change its planned method or manner of

performing the contract work, for which the Joint Venture is entitled to an equitable adjustment pursuant to FAR 52.243-4 entitled "Changes" of the Contract General Provisions for all additional costs, impacts and delays incurred as a result thereof.

55. By letter dated February 11, 2005 the Joint Venture submitted its certified claim to the Government and requested a Contracting Officer's final decision.

56. By letter dated March 16, 2005 the Government indicated that it would issue a decision by September 23, 2005.

57. By letter dated September 22, 2005 the Contracting Officer issued a final decision denying the claim in its entirety.

WHEREFORE, A.A.B Joint Venture, by counsel, respectfully requests this honorable Court grant judgment in favor of A.A.B Joint Venture against Defendant the United States of America as follows:

(a) Monetary relief in such sums as the Court, based on the evidence produced at trial, deems appropriate;

(b) A time extension for both excusable/compensable delay and excusable/noncompensable delay based on the evidence produced at trial;

(c) Statutory interest under the Contract Disputes Act; and

(d) Such other and further relief as the Court deems just and proper.

Dated: November 2, 2005

Respectfully submitted,

Brian Cohen
BELL, BOYD & LLOYD, PLLC
1615 L Street, NW
Suite 1200
Washington, D.C. 20036
(202) 466-6300
Attorney for Appellant

Of Counsel:

Lawrence M. Prosen
Philip C. Jones
BELL, BOYD & LLOYD, PLLC
1615 L Street, N.W., Suite 1200
Washington, D.C. 20036
(202) 466-6300

Devorah Patt
P. O Box 2221
Savyon 56528
Israel

**CERTIFICATE OF SERVICE**

THE UNDERSIGNED DOES HEREBY CERTIFY that a copy of the foregoing First Amended Complaint, was mailed via first-class, U.S. Mail, postage pre-paid this 3rd day of November, 2005, upon:

David Cohen
Director
Civil Division
United States Department of Justice
8th Floor, 1100 L Street, N.W.
Washington, D.C. 20530

Brian Cohen